Attachment "A"

## OHIO FIRST DISTRICT COURT OF APPEALS

the proceedings. And the state had subpoenaed numerous witnesses and was prepared to start the trial.

Based on all of these factors, which the trial court explicitly considered, we hold that the court did not err in denying Smith's request to change attorneys. We emphasize that Smith's disagreement with counsel was not, as stated in Smith's brief, related to the approach to be taken or the strategy to be used during the trial. It related instead to the decision not to pursue a federal action based on the earlier denial of the motion to preclude the second trial of Smith on the murder charge. Again contrary to Smith's allegations, the trial court did allow him to explain fully his disagreement with counsel. Smith was allowed to address the court directly, and the court's statement that it would not "hear from him again" was only an indication that it would further communicate with him through his counsel with respect to all other matters.

Finally, the affidavit that Smith filed, which related to alleged financial problems between him and counsel, contained the allegation that counsel had been neither retained nor appointed and further alleged the existence of a potential conflict of interest. But the affidavit was not presented to the court until *after* the trial as part of a motion for a new trial, so the court could not have considered it in deciding whether to grant a continuance before the trial. Smith does not challenge the denial of his motion for a new trial. Therefore, we overrule the first and second assignments of error relating to the trial court's denial of Smith's request, on the morning of trial, to change counsel.

## PHOTOGRAPHIC LINEUP

Smith next alleges, in his third assignment of error, that the trial court erred in admitting into evidence the photographic lineup shown by the police to a witness,

*Ä"I*

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO. C-970349
                                                   TRIAL NO. B-9609928
    Plaintiff-Appellee,            :

vs.                                     :          *OPINION.*

EDWARD SMITH,                           :          PRESENTED TO THE CLERK
                                                   OF COURTS FOR FILING
    Defendant-Appellant.           :
                                                   OCT 1 6 1998

Criminal Appeal From: Hamilton County Court of Common Pleas          COURT OF APPEALS

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: October 16, 1998

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee.

*H. Fred Hoefle* and *John H. Burlew*, for Defendant-Appellant.

Page 5

Attachment "A"I

OHIO FIRST DISTRICT COURT OF APPEALS

instances of misconduct, all of which occurred during closing argument.  We examine each of these alleged instances in turn,[3] keeping in mind that despicable behavior and terrible crimes do not preclude the duty to zealously protect the substantial constitutional rights of those accused of such offenses.  We observe that the senselessness, cruelty, and abhorrence of crimes periodically incenses even experienced and capable prosecutors beyond constitutional and professional control.  While this is understandable, it should not be permitted to denigrate the cherished constitutional requirement of fair trial.  We take no pleasure in applying the standard in such cases, and do so not as zealots, but pursuant to our sworn duty to uphold constitutional protections.

### A.  ALIBI COMMENT

Smith takes issue with the prosecutor's comment during closing argument regarding his lack of an alibi:

> Let's think about what you have heard in this case and the evidence that you have heard.  And I have a list *** first of all, we have a lady who made a very good identification. ***

> But what happens then, the police start to investigate, and they find another man who happens to have seen a person who looked like this person with the victim minutes before the victim was killed. The odds go up a little bit, don't they?  Get a little better. ***

> And then we have item number three. Mr. White says Mr. Jenkins wouldn't pick anybody up in the truck unless it was about business, a business partner, businessman, business.  Odds go up a little bit more.

> Then the witness, and this is pretty important, because *the witness has picked somebody who doesn't have an alibi.*  [Emphasis added.]

---

[3] While we have reviewed these alleged instances of prosecutorial misconduct in the context of the entire case, for convenience we present our analysis of each of these instances separately.

Defense counsel immediately objected to this comment; the objection was sustained by the trial court. At sidebar, defense counsel moved for a mistrial, arguing that the prosecutor had improperly commented on Smith's failure to testify and had improperly shifted the burden of proof. The trial court denied defense counsel's motion for a mistrial and then brought the jury back without giving any curative instruction.

Initially, we must determine whether the remark in question was, in fact, a comment adversely directed to Smith's decision not to testify. Such comments are, of course, prohibited by the Fifth Amendment.[4] The answer to this question, under the facts of this case, is that the prosecutor's alibi comment *was* adversely directed to Smith's decision not to testify. This conclusion is required because the prosecutor knew that Smith had told the police that he could not corroborate an alibi and also knew that Smith had not filed a notice of alibi, and thus had nothing to offer as testimony in his defense against apparent evidence of his guilt. The state argues that the comment was meant to say that the state's evidence was strong, but that is not what was said. The prosecutor said that "somebody", i.e., the defendant Smith, "doesn't have an alibi." The law derives intention from the results of words or actions. It is natural to conclude that the intention of such language is to underscore Smith's failure to testify and his silence as to an alibi. A reasonable juror could conclude that if Smith had an alibi he would not remain silent. The words spoken have a plain meaning, and we cannot speculate that they were intended to mean something not said.

---

[4] *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229; *State v. Clark* (1991), 74 Ohio App.3d 151, 156, 598 N.E.2d 740, 743.

OHIO FIRST DISTRICT COURT OF APPEALS

We further determine that the alibi comment may very well have created the belief in the minds of the jury that the defense had a burden of proof on the matter of alibi, particularly with no curative instructive from the trial judge.

### B. DENIGRATION OF DEFENSE COUNSEL

The second instance of prosecutorial misconduct of which Smith complains relates to the prosecutor's denigration of defense counsel. The following comments were made by the prosecutor during closing argument:

> Mr. Burlew is a very nice man. He's one of the best criminal lawyers in Cincinnati. And I say that and I mean it, and I respect him greatly. *And he's really, really good at making, and maybe you've heard the term before, chicken salad out of chicken -- fill in the blank.* Maybe you've heard it before. Maybe you haven't. And he's done a superb job at doing that. Okay?

> And I can't emphasize to you enough, because he got up here at closing argument and he was arguing that I was going to attack him, and we're going to attack the lawyer because we don't have any evidence, so on and so forth; and I apologize to him ahead of time because I am going to attack him. I have to. He's put me in the position where I can do nothing else, *because he has tried the whole case not by evidence, but by his speeches and misrepresentations.* [Emphasis added.]

The following then took place in the jury's presence: defense counsel immediately stated to the trial court, "I demand an apology *** [a]nd I demand a reprimand from you to this jury certifying to them that I have violated no canon, none of your admonitions in this case;" the trial court suggested that an apology was appropriate; the apology was made by the prosecutor; it was accepted by defense counsel; and the trial court then admonished the prosecutor, stating that "we're going to turn our attention to the evidence in this case and not upon personal nature of counsels; we are, aren't we?"

<u>OHIO FIRST DISTRICT COURT OF APPEALS</u>

As this court stated in *State v. Hart*,[5] our adversarial system permits and even encourages prosecutors to argue fervently for conviction.    Accordingly, courts have consistently recognized that the prosecution is entitled to a wide degree of latitude and freedom of expression during summation in discussing what the evidence has shown and what reasonable inferences may be drawn therefrom.[6]  Thus, the prosecutor was clearly entitled in this case to comment on the testimony and to suggest the conclusions to be drawn from it.[7]  He was also free to highlight the relative strength of the prosecution's case and relative weakness of the defense.

The latitude afforded the prosecution does not, however, extend so far as to permit the prosecution to denigrate the role of defense counsel.[8]   The prosecutor's comments in this case, in effect, suggested to the jury that defense counsel had intentionally deceived the jury by engaging in misrepresentations. As we stated in *Hart*:

> [a] prosecutor may argue and argue ardently that the evidence does not support the conclusion postulated by defense counsel.   A prosecutor may not, however, denigrate the role of defense counsel by injecting his personal frustration with defense tactics ***. *** The prosecutor was not entitled to employ *** argument to denigrate the role of defense counsel and to insinuate to the jury that [the defendant] and his counsel, by exercising their right to suggest what conclusions may or may not have been drawn from the evidence found at trial, were seeking to hide the truth.[9]

We cannot subscribe to the state's argued exculpation of such conduct.  Rather, we agree with defense counsel that this personal attack was completely baseless and improper, and

---

[5] 94 Ohio App.3d at 671, 641 N.E.2d at 759.
[6] *Id.*, citing *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773, 777.
[7] *Maurer*, supra.
[8] *Hart*, supra; *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207.
[9] 94 Ohio App.3d at 673-674, 641 N.E.2d 755, 760.

OHIO FIRST DISTRICT COURT OF APPEALS

constituted error. Furthermore, it had the dangerous potential of tainting the jury's view of Smith's defense.

Aside from the crude analogy pertaining to the ingredients of chicken salad, which was inappropriate to the dignity of trial, we are intuitively and legally repulsed by the prosecutor's purposeful attack statement that defense counsel personally tried the case by misrepresentations. The quotation from *State v. Hart, supra*, applies to the matter *sub judice* like a poured mold; this admitted personal attack was completely improper and rises to the level of constitutional error. Further, under the facts of this case, we cannot remove prejudice to a fair trial by a court-extracted apology, the appearance of apparent evidence of guilt, and a court instruction that statements made by counsel are not evidence. Nor can we subscribe to the argument that the trial court tacitly acknowledged that there was no misconduct. Why would defense counsel and the trial judge demand an apology, but for misconduct? The effect on the jury of this personal denigrating attack by the prosecution upon defense counsel, alleging misrepresentations, was akin to invasive radioactive fallout that could not be totally eradicated.

## C. BAD CHARACTER

Third, Smith contends that he was prejudiced by the following statement made by the prosecutor during closing argument:

> You heard it all. The guy she picks, all of a sudden being desperate for money, decides to take his car to Kentucky and abandon it. Why did he do that? He wants to leave the car in Kentucky, he needs cash, he leaves the car in Kentucky. And then the same guy that she picks tries to sell it for 500 bucks to Ferguson.
>
> ***
>
> So one minute he's a local long-time businessman, and then the next minute the guy that she sees, he's going to leave town, is trying to get some quick cash, he's trying to get three grand above

1       A.       Approximately twenty-and-a-half years.

2       Q.       Were you a police officer before you were

3 with the FBI?

4       A.       That is correct.

5       Q.       And where were you a police officer

6 before that?

7       A.       I was employed in two places, Lincoln

8 Heights, Ohio, first, and Woodlawn.

9       Q.       What, exactly, are your duties, now, in

10 the FBI?

11       A.       I'm assigned to organized crime.

12       Q.       Do you have specialized training in your

13 duties and background as an organized crime -- in your

14 organized crime assignment?

15       A.       I do.

16       Q.       And what kind of specialized training

17 have you received?

18       A.       I've been trained in collecting,

19 preserving evidence, interviewing people, arrest

20 situations, search and seizure.

21       Q.       Okay.  And do you do undercover work?

22       A.       Yes, I do.

23       Q.       What kind of undercover work do you do?

24       A.       I've done fraud against the government,

25 theft of interstate shipment, I've done drugs, political

1    corruption; that's about it.

2        Q.        Okay.  And have you done -- been involved

3    in undercover situations that involve dangers?

4                        THE COURT:  Can we move this along?

5                        MR. LEON:  This is my last question.

6                        THE COURT:  I don't know the relevancy.

7                        MR. LEON:  I'll tie it up.

8                        THE COURT:  Let me see you at sidebar,

9        please.

10                        (The following proceedings were had at

11        sidebar conference.)

12                        MR. LEON:  What?

13                        THE COURT:  What's the relevancy?  Is he

14        an expert witness or something?

15                        MR. LEON:  He will be testifying that

16        when he came upon the situation, that he was --

17        basically, his training and his experience as a

18        police officer, he was frightened enough to pull

19        his firearm when he saw what was happening between

20        Spikner and the defendant.  He's a trained --

21                        THE COURT:  What's the relevancy?

22                        MR. LEON:  There's a dispute here about

23        whether or not the defendant had a gun.  This

24        witness will testify that Spikner told him that he

25        had a gun.  He withdrew his weapon when they came

Attachment "B"

1          on the scene because of his fear, based on his

2          training.  That gives relevance to his actions.

3                    MR. BURLEW:  Spikner never testified to

4          that.

5                    THE COURT:  Spikner never said he saw a

6          gun.  You don't object?

7                    MR. BURLEW:  I do object.

8                    MR. LEON:  He's going to testify --

9                    THE COURT:  No.  Are you trying to

10         impeach your own witness?

11                   MR. LEON:  No.

12                   THE COURT:  Then I'm not allowing it.

13                   Thank you.

14                   (The following proceedings were had in

15         open court, in the presence of the jury.)

16    BY MR. LEON:

17         Q.        On December the 27th, 1996, were you in

18    Lincoln Heights?

19         A.        I was.

20         Q.        And you were here for what reason?

21         A.        I was on vacation.

22         Q.        You are related or were related to the

23    victim in this case, Eugene Jenkins?

24         A.        That's correct.

25         Q.        What was your relationship?

Attachment "C"

463

1          Q.          Are you required to notify the agent in

2     charge, or his representative, if you get involved in a

3     criminal investigation in another jurisdiction?

4          A.          That is correct.

5          Q.          And that's why your agent in charge was

6     in New York, and he was the only -- and that's where

7     geographical limits were, unless he authorized you to

8     travel outside those limits or be involved in an

9     investigation outside of those limits, is it not?

10         A.          That is not the FBI protocol, sir.

11         Q.          So you can go where you want?

12         A.          Would you like for me to explain the

13    protocol to you?

14         Q.          I'd like the answer to my question.  Can

15    you go where you want?

16         A.          No, you cannot go where you want.

17         Q.          Can you volunteer to assist any

18    department that you want to get involved in?

19         A.          I can volunteer, that is correct.

20         Q.          And you need no prior permission?

21         A.          With permission, yes, sir.

22         Q.          Did you have permission?

23         A.          I did not.

24         Q.          Now, when you went with Mr. Spikner to

25    this garage, how did you know that that was Ed Smith's

1    garage?

2              A.         Mr. Spikner told me it was his.

3              Q.         He told you that it was Ed Smith's

4    garage?

5              A.         He told me that's where he stored the

6    tools, yes, sir.

7              Q.         Where was your warrant to go inside?

8              MR. LEON:  Objection.

9              THE COURT:  Overruled.

10             A.         I had no warrant.

11             Q.         You had no authority to go inside,

12   correct?

13             MR. LEON:  Objection.

14             THE COURT:  Overruled.

15             A.         I did not have a warrant, no, sir.

16             Q.         As a matter of fact, the police chief you

17   talked to was the chief of Lincoln Heights?

18             A.         Yes.

19             Q.         He had no authority to police the streets

20   of the City of Cincinnati, did he?

21             MR. LEON:  Objection.

22             THE COURT:  Sustained.

23             Q.         Did you ever ask him if you were

24   permitted to go into the City of Cincinnati?

25             MR. LEON:  Objection.

1              THE COURT:  Overruled.  You may answer.

2         A.        No, sir, I did not.

3         Q.        Now, what could have happened is that you

4    could have endangered a private citizen by going into

5    property that is not authorized to go into, for which you

6    had no warrant, correct?

7              MR. LEON:  Objection.

8              THE COURT:  Overruled.

9              MR. LEON:  Can we approach?

10             THE COURT:  Yes.

11                 (The following proceedings were had at

12        sidebar conference.)

13             MR. LEON:  Judge, the insinuation that a

14        warrant was somehow required is something -- it's

15        a legal conclusion.  The jury needs to know and

16        understand that a warrant's not required for the

17        employee of the defendant to go into the garage

18        that he works in.  This is misleading the jury.

19             THE COURT:  Well, go ahead, Mr. Burlew.

20             MR. BURLEW:  Judge, I'm not misleading

21        the jury.  I think the State went into all of this

22        and tried to qualify him as an expert law

23        enforcement officer.  He violated his own

24        protocol.  And that's just a fact, that he had no

25        warrant, no authority.  I'm not attacking the

1    search, we've done that pretrial.

2            MR. LEON:  Exactly.  That's my point.

3            MR. BURLEW:  I'm not trying to suppress

4    anything.

5            MR. LEON:  I don't have a problem with

6    the questions, necessarily, other than the fact

7    that the insinuation here is that he violated a

8    duty to get a warrant when, in fact, it wasn't

9    necessary.  And, you know, it's a legal

10   conclusion.  It's not a whole lot different than

11   having a statement with a motion to suppress, and

12   then in trial attacking the propriety of taking

13   the statement.  It's a pretrial decision we're

14   talking about.

15           THE COURT:  Actually, with respect to a

16   statement, it's both a trial and a pretrial.  So I

17   disagree on that point.  I understand the point

18   you're trying to make, though.

19           MR. BURLEW:  I'm not attacking the

20   search, but you can't hold him up as the world's

21   greatest policeman, and have him violate rules.

22   It's disingenuous.

23           MR. LEON:  But he did not violate a rule

24   about a warrant, and that's the implication,

25   because he went to a garage that this employee had

1    access to.

2        THE COURT:  The reason I permitted -- I

3    take all this as seeking my explanation as to the

4    reason for my ruling.  And the reason I permitted

5    it is that number one, a law enforcement officer

6    cannot direct somebody to do something and make it

7    a permissible search, number one.  So I disagree

8    with your legal conclusion that the officer can

9    direct a private citizen to enter a private space

10   and obviate the need for a warrant.

11       Number two, there's no basis for a

12   contention that this person, Mr. Spikner, had the

13   authority.  I have heard no testimony that he had

14   the authority to consent to a search.  So I

15   disagree with your overall premises.

16       Number two, what -- you set him up as

17   probably the most experienced law enforcement

18   officer that's going to be testifying in this

19   trial.  And, certainly, if he's circumventing a

20   procedure, that's something that Mr. Burlew's

21   entitled to bring to the jury's attention.

22       Number three, I permitted that last

23   question, and that's what I think brought us all

24   up here, because he's testified that he took

25   certain actions to protect the safety of a private

1      citizen.  And the last question, I believe,

2      Mr. Burlew just asked, was what he was doing

3      actually endangering Mr. Spikner, so that would

4      contradict his previous testimony.  So that's why

5      I permitted that question.

6                    (The following proceedings were had in

7      open court, in the presence of the jury.)

8                    MR. BURLEW:  Would you read the last

9      question back.

10                   (The pending question was read back by

11     the court reporter.)

12                   THE COURT:  Sir, go ahead and answer.

13     A.        That is correct.

14     Q.        Now, you talked about your training, what

15     is your homicide training?

16     A.        I worked approximately seven homicide --

17     Q.        When was that?

18     A.        I worked five in Lincoln Heights.

19     Q.        How many years ago was that?

20     A.        That was in 1972 through '78.

21     Q.        Okay.

22     A.        And I worked two in Woodlawn.

23     Q.        Any with the FBI?

24     A.        Homicides?  No.

25     Q.        So your training insofar as homicide or

1    homicide investigation was limited to what was available

2    to you in Lincoln Heights and Woodlawn, right?

3            A.        That's correct.

4            Q.        You're not claiming that you're an expert

5    homicide investigator, are you?

6            A.        No, sir.

7                    MR. BURLEW:  Just one moment, Your Honor.

8                    THE COURT:  Yes.

9                    MR. BURLEW:  One other question.  Sorry.

10                   THE COURT:  That's okay.

11           Q.        You indicated that you drew your weapon,

12   correct?

13           A.        Yes.  Yes, sir.

14           Q.        And you're trained by the FBI, correct?

15           A.        Yes, sir.

16           Q.        You only draw your weapon when you're

17   ready to kill, correct?

18           A.        In preparation thereof, yes, sir.

19           Q.        You are not to draw your weapon unless

20   you're prepared to fire it and kill, correct?

21           A.        That is correct.

22           Q.        You're not trained to shoot to wound or

23   to pull that weapon to scare, intimidate, or frighten, but

24   to kill?

25           A.        That is correct.

1          Q.          So with no homicide investigation,

2     without notifying the agent in charge, you took a private

3     citizen to the scene, and you were prepared to kill?

4          A.          That is correct.

5                    MR. BURLEW:  Thank you.

6                         REDIRECT EXAMINATION

7     BY MR. LEON:

8          Q.          Did you -- did you force Mr. Spikner to

9     take you to the storage area?

10         A.          He volunteered.  He wanted to check to

11    see -- he was supposed to work that day, he wanted to

12    check to see if the tools were there.

13                    MR. BURLEW:  Objection.

14                    THE COURT:  I'll permit it.

15                    MR. LEON:  Nothing further.

16                    THE COURT:  Anything further?

17                    MR. BURLEW:  Nothing further.

18                    THE COURT:  May I excuse this witness?

19                    MR. LEON:  Yes, ma'am.

20                    MR. BURLEW:  No objection.

21                    THE COURT:  You are free to go about your

22         business.

23                    (Witness excused.)

24                    THE COURT:  Is this a good time for a

25         break?  Let's take our break, till twenty minutes

1    Murder She Wrote, don't let it be Sam Shepherd.

2    And your verdict, more than anything else, has got

3    to be just.  The State agrees, has always agreed,

4    says:  I will prove to you beyond a reasonable

5    doubt these facts.

6          Was there a predisposition for Michelle

7    Thomas?  Of course there was.  When Rozier was

8    called -- I didn't call him as a witness, but I

9    asked questions:  Did you have any authority?  No.

10   Did you report to the agent involved?  No.  You

11   knew the rules, but you didn't do them?  No.  You

12   knew the name of Ed Smith, didn't you?  He's a

13   person I knew about.  You took him into custody

14   and went on out on your own.  Not fancy the facts,

15   that's what happened.

16         Michelle Thomas, I saw a person in

17   disguise.  Forget the fact that no one else, not

18   Mr. White, not Mr. Jenkins, no one has ever

19   mentioned the word disguise.  When do you use the

20   word disguise?  You use the word disguise when

21   there's an attempt to conceal identity or to cover

22   features.  Yet, although she said it was a

23   disguise, she gives all of these descriptions.

24         And then she's faced with a lineup, and

25   Sergeant Stevenson said the only thing that she

```
 1          A.         Look on his face, and being that time of

 2   morning, and the quickness -- the way he was running, you

 3   know, the fastness.

 4          Q.         And you didn't look at your children?

 5          A.         No.  I was just going to get a phone

 6   number.

 7          Q.         I understand.  But at the point you felt

 8   frightened or threatened --

 9          A.         I didn't feel frightened.  I felt

10   something had happened, but I didn't make a big deal about

11   it, just kept walking.

12          Q.         Didn't imprint on you in any way?

13          A.         No.

14          Q.         And the person went past you?

15          A.         Right.

16          Q.         And this wasn't any big deal, you went to

17   your friend's house with your children, right?

18          A.         Yes.

19          Q.         At some point later you thought that was

20   significant, and you gave descriptions of the person,

21   correct?

22          A.         Right.

23          Q.         And the description that you gave was of

24   an older person?

25          A.         Right.
```

1        Q.      Gray full beard?

2        A.      No.  I said gray and black.

3        Q.      I'm sorry, gray and black full beard?

4        A.      Right.

5        Q.      Gray and black full beard?

6        A.      Right.

7        Q.      Glasses?

8        A.      Right.

9        Q.      You really didn't even know if the person

10 was in a disguise or not, did you?

11       A.      No.  They looked like a normal person.

12       Q.      You didn't use the word "disguise?"

13       A.      No.

14       Q.      Okay.

15       A.      Like I say, he had a cap on and glasses.

16       Q.      And did you not, when you talked to the

17 Grand Jury, say you didn't know if it was a disguise or

18 something like that?

19       A.      I wasn't sure.

20       Q.      Exactly.  And the person ran by, because

21 it was not a big imprint on you at the time, correct?

22       A.      I remember.

23       Q.      Okay.  Do you remember a young man who

24 was sitting at that desk in this courtroom when you

25 testified earlier?

```
 1          A.      Here?

 2          Q.      Yes.

 3          A.      Yes.

 4          Q.      At that desk over there?

 5          A.      What young man?  That one?

 6          Q.      No, not that one.  The one that was

 7   sitting as a clerk in this courtroom.

 8          A.      Yes.

 9          Q.      Do you recall what he was dressed in?

10                  MR. LEON:  Objection.

11                  THE COURT:  Overruled.

12                  Go ahead.

13          A.      I think he had a two-piece suit on.  I

14   don't know if it was like dark brown, I'm not sure.

15          Q.      And his nose, how was his nose?

16          A.      Like down, like that.  I mean --

17          Q.      My point is this:  You don't remember

18   people that don't make an impression on you.

19          A.      Well, he --

20          Q.      Do you?

21          A.      Yes, I do.

22          Q.      You remember people who don't make an

23   impression on you?  You remember the guard at the front of

24   the courthouse?

25          A.      No.
```

1       Q.      You remember any other people coming in

2  and out of this courtroom?

3       A.      Yes.  Well, I've seen a few people that

4  are here, yes.

5       Q.      When nonevents occur, something that

6  doesn't make you think, you don't draw detailed

7  descriptions, you don't have detailed descriptions, do

8  you?

9       A.      Mr. Burlew, I know what I seen.

10       Q.      You testified that you saw a photographic

11  array?

12       A.      Yes.

13       Q.      And before you saw that photographic

14  array --

15       MR. BURLEW:  May I approach, Your Honor?

16       THE COURT:  Oh, yes, go ahead.

17       Q.      And before you saw this photographic

18  array, you had told the police of a person that you'd

19  seen, you described an older person?

20       A.      Yes.

21       Q.      Over forty?

22       A.      Yes.

23       Q.      A full mixed gray beard?

24       A.      Correct, yes.

25       Q.      Glasses?  Correct?

A.       Yes.

Q.       And also, when you saw them, they said that they wanted you to pick out the person that had -- that you'd seen at the scene, correct?

A.       Correct, yes.

Q.       How many people in that array that they showed you were over forty, had a full beard, mixed gray?

A.       Just one.

Q.       There was only one person in there, and that was Mr. Ed Smith, correct?

A.       Yes.

Q.       And so you told them of these features, and they showed you a picture where he was the only one with the features that you had described to them?

A.       The pictures here, yes.

Q.       And before that, you talked to Mr. Rozier, who was a cousin of the family, of the Jenkins family?

A.       I don't remember.

Q.       Well, do you remember testifying in front of the Grand Jury?

A.       Yes, uh-huh.

Q.       Would you like to refresh your recollection of your testimony? '

A.       Yes.

1      Q.      You want to read those two pages, pages 7

2   and 8?

3      A.      Okay.

4      Q.      You were under oath when you gave that

5   testimony, were you not?

6      A.      Yes.

7      Q.      Before you made the identification in

8   that photo array, you also talked to a cousin of

9   Mr. Jenkins, correct?

10      A.      Was it at the scene?

11      Q.      That's not what I asked you.  Before you

12   picked out Mr. Smith in that lineup --

13      A.      Uh-huh.

14      Q.      -- you talked to an FBI person?

15      A.      Yes, I did.  I don't remember his name.

16      Q.      But he was a cousin of Mr. Jenkins, or

17   the family, correct?

18      A.      I guess, yes.

19      Q.      Well, he told you Ed Smith was one of the

20   people he was thinking about, did he not?

21                  MR. LEON:  Objection.

22                  THE COURT:  Overruled.

23      A.      If he was the one -- I don't remember, it

24   was so many people I talked to.

25      Q.      Did any person tell you anything like

1    that?

2         A.        That they were a cousin of Mr. Jenkins?

3         Q.        That Mr. Ed Smith, they thought Ed Smith

4    was the person who did it?

5              MR. LEON:  Objection.

6              THE COURT:  Overruled.

7         A.        Yes.

8              THE COURT:  Are you talking about law

9         enforcement?

10             MR. BURLEW:  Yes.

11             THE COURT:  Then limit it to that.  You

12        said "they."

13        Q.        Did this law enforcement person tell you

14   that Ed Smith was one of their suspects?

15        A.        I don't remember.

16        Q.        Even reading your testimony you don't

17   remember?

18        A.        I don't remember.

19        Q.        In addition to that, you saw Mr. Smith's

20   picture on television, did you not?

21        A.        Uh-huh.

22             THE COURT:  Excuse me.  What was your

23        answer?

24             THE WITNESS:  Yes.

25             THE COURT:  Thank you.

1      Q.      And in addition to seeing his picture on

2    TV, and someone telling you -- you're shaking your head

3    no?

4         A.      Go ahead.

5         Q.      They told you that they had a suspect in

6    that shooting when they took you to the lineup?

7              MR. LEON:  Objection.

8              THE COURT:  Again, who are you talking

9       about, Mr. Burlew?

10           MR. BURLEW:  Law enforcement.

11           THE COURT:  Okay.

12         A.      I didn't see him on TV until later, in my

13    home.

14         Q.      I agree.  But you describe, yourself, in

15    your own testimony --

16         A.      Yes.

17         Q.      -- as:  After this happened, I was kind

18    of traumatized?

19         A.      Yeah.

20         Q.      Initially.  But I am sure, 'cause I saw a

21    picture on TV.  I'm sure because I saw the lineup.  I'm

22    sure because they said he was a suspect.  You are sure

23    that it was Ed Smith, correct?

24           MR. LEON:  Objection.

25           THE COURT:  Overruled.

Attachment "E"

IN THE SUPREME COURT OF OHIO

EDWARD SMITH,                        :    Appeal from the judgment of the
      Appellant,                  :    First Appellate District of Ohio
v.                                  :    For Hamilton County, Court of
STATE OF OHIO,                      :    Appeals Case No. C-990689, Denying
      Appellee.                   :    Application for Reopening
                                             :

---

## NOTICE OF APPEAL OF APPELLANT EDWARD SMITH

---

COUNSEL FOR APPELLANT:
IN PRO SE
EDWARD SMITH
INST.NO. A346-408
WARREN CORR.INST.
P.O. BOX 120
LEBANON, OHIO  45036

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
COUNSEL FOR APPELLEE:
MICHAEL K. ALLEN
HAMILTON COUNTY PROSECUTOR, AND
PHILIP R. CUMMINGS,
ASS'T PROSECUTING ATTORNEY
7000 TAFT LAW CENTER
230 EAST NINTH STREET
CINCINNATI, OHIO  45202
(513) 946- 3010
(513) 946-3021 (fax)

<u>Notice of Appeal of Appellant Edward Smith</u>

    Appellant Edward Smith, pro se, hereby gives notice of appeal to the Supreme Court of Ohio from the judgment of the Hamilton County Court of Appeals, First Appellate District, from the judgment denying Application for Reopening journalized and filed on July 31, 2001. This Application for Reopening of direct appeal of Trial Court Case No. B-9609928, Hamilton County, Ohio (2000), <u>State v. Smith</u>.

    This appeal is being taken pursuant to Supreme Court Rule II, Section 1(A)(2), being a claimed appeal of right, which involves numerous constitutional questions and concerns a felony conviction.

                    Respectfully submitted,

                    _Edward Smith_

                    Edward Smith, appellant, pro se
                    Inst. No. A346-408
                    Warren Corr.Inst.
                    P.O. Box 120
                    Lebanon, Ohio  45036

<u>PROOF OF SERVICE</u>

I, Edward Smith, appellant herein, pro se, do hereby certify that a copy of this Notice of Appeal was given to prison officials for mailing in the prison's internal legal mail system, first class, U.S. Mail, postage prepaid to:  Hamilton County Prosecutor's Office, ATTN: Michael K. Allen, and Philip R. Cummings, 7000 Taft Law Center, 230 East Ninth Street, Cincinnati, Ohio, 45202, on this 16 day of August, 2001.

                    _Edward Smith_

                    Edward Smith, appellant, pro se
                    Inst. No. A346-408
                    Warren Corr.Inst.,P.O. Box 120,
                    Lebanon, Ohio  45036

*file, Stamp, Copy Return*

IN THE SUPREME COURT OF OHIO

EDWARD SMITH,                          : On Appeal from the Hamilton County

   Appellant,                  : Court of Appeals, First Appellate

v.                                     : District, Court of Appeals Case

STATE OF OHIO,                         : No. C-9609928, Denying Application

   Appellee.                   : for Reopening of direct appeal.

             :

---

MEMORANDUM IN SUPPORT OF JURISDICTION OF APPELLANT EDWARD SMITH

COURT OF APPEALS CASE NO. C-9609928

---

COUNSEL FOR APPELLANT:

EDWARD SMITH, PRO SE

INMATE NO. A346-408

WARREN CORR.INST.

P.O. BOX 120

LEBANON, OHIO  45036

‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡

COUNSEL FOR APPELLEE:

HAMILTON COUNTY PROSECUTOR'S OFFICE

ATTN: MICHAEL K. ALLEN, AND

PHILIP R. CUMMINGS, HAMILTON COUNTY

PROSECUTING ATTORNEY & ASS'T PROSECUTING ATTY.

7000 TAFT LAW CENTER

230 EAST NINTH STREET

CINCINNATI, OHIO  45202

(513) 946-3010

(513) 946-3021 (fax)

# TABLE OF CONTENTS

PAGE NO.

EXPLANATION OF WHY THIS CASE IS A CASE OF PUBLIC OR
GREAT GENERAL INTEREST AND INVOLVES A SUBSTANTIAL
CONSTITUTIONAL QUESTION.............................. 1,2

STATEMENT OF THE CASE AND FACTS...................... 3

ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW.......... 4-9

Proposition of Law Number I: THE APPELLANT HAS BEEN DENIED
BOTH DUE PROCESS/DUE COURSE OF LAW AND EQUAL PROTECTION OF
LAW IN VIOLATION OF BOTH THE OHIO AND UNITED STATES CONSTIT-
UTION BY THE FIRST DISTRICT COURT OF APPEALS'JUDGMENT DENYING
THE APPELLANT'S APPLICATION FOR REOPENING AND THIS COURT'S
RULING IN: STATE EX.REL.TYLER V. ALEXANDER, 52 OHIO ST.3D 84... 4,5

Proposition of Law Number II: THE TRIAL COURT ABUSED ITS'
DISCRETION AND COMMITTED PLAIN ERROR PURSUANT TO OHIO CRIMINAL
RULE 52(B) BY ALLOWING TESTIMONY OF WITNESSES WHICH HAD VIOLATED
THE APPELLANT'S CONSTITUTIONAL RIGHTS UNDER THE FOURTH  AMENDMENT
TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, § 14 OF THE
OHIO CONSTITUTION.................................... 6

Proposition of Law Number III: THE TRIAL COURT ABUSED ITS'
DISCRETION IN DENYING THE APPELLANT'S MOTION FOR A NEW TRIAL
VIOLATING THE APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL
UNDER THE FIFTH,SIXTH,AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION, ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTIT-
UTION............................................... 6,7

Proposition of Law Number IV:  THE TRIAL COURT COMMITTED REVERSIBLE
ERROR BY INSTRUCTING THE TRIAL JURY ON THE CULPABLE MENTAL STATE
(MENS REA) OF THE ELEMENT OF PURPOSE/INTENT OF THE CRIMINAL OFFENSE
OF MURDER, R.C.2903.02, IN VIOLATION OF THE APPELLANTS' FOURTEENTH
AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION, ARTICLE I,
§§ 10 & 16, SHIFTING THE BURDEN OF PROOF TO THE APPELLANT, BEING
PLAIN ERROR PURSUANT TO OHIO CRIMINAL RULE 52(B)............... 7,8

Proposition of Law Number V: THE APPELLANT WAS DENIED EFFECTIVE
ASSISTANCE OF COUNSEL (ON APPEAL) PURSUANT TO THE STANDARDS SET
IN : STRICKLAND V. WASHINGTON,(1984), 466 U.S.668, AND STATE V.
BRADLEY, (1989), 42 OHIO ST.3D 136, DENYING THE APPELLANT HIS
CONSTITUTIONAL RIGHTS UNDER THE FIFTH,SIXTH,AND FOURTEENTH AMEND-
MENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS TEN
AND SIXTEEN OF THE OHIO CONSTITUTION TO EFFECTIVE ASSISTANCE OF
COUNSEL............................................................ 8,9

TABLE OF AUTHORITIES:

    United States Constitution:
        Fifth Amendment................................. 5,6,7,8
        Sixth Amendment................................. 1,6,7,8
        Fourteenth Amendment............................ 1,5,6,7,8

    Federal Caselaw Cites:

        Huston v. Lack, 487 U.S. 266, 108 S.Ct.2379(1988).. 1,5

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

STATE OF OHIO,

      Plaintiff-Appellee,

      vs.

EDWARD SMITH,

      Defendant-Appellant.

APPEAL NO. C-990689

*ENTRY DENYING APPLICATION
FOR REOPENING.*

This cause came on to be considered upon the appellant's App.R. 26(B) application to reopen this appeal, upon the state's memorandum in opposition, and upon the appellant's memorandum in reply.

App.R. 26(B)(1) requires an application to reopen an appeal to be filed with the court of appeals within ninety days from the date on which the appellate judgment was journalized, unless the applicant shows good cause for filing it at a later time. This court's judgment was journalized on November 3, 2000, and the appellant's application was filed on February 8, 2001; therefore, the application was filed seven days after the ninety-day period had expired.

The appellant offers no showing of good cause to justify the delay in filing his application. Instead, citing App.R. 13(A) and the United States Supreme Court's decision in *Houston v. Lack* (1988), 487 U.S. 266, 108 S.Ct. 2379, he contends that his

application was timely filed when, on January 30, 2001, he delivered it to the prison mail room.

The "mailbox" rule provided by App.R. 13(A) applies, by its terms, to appellate "briefs." Although an application to reopen an appeal contains elements of an appellate brief, it also functions, like a notice of appeal, to confer upon this court jurisdiction over the matters properly presented therein. In *State ex. rel. Tyler v. Alexander* (1990), 52 Ohio St.3d 84, 555 N.E.2d 966, the Supreme Court of Ohio declined to adopt the "prison mail room" rule established by the United States Supreme Court in *Houston, supra,* and held that a notice of appeal is "filed" for purposes of the Supreme Court Rules of Practice, not when it is delivered to prison authorities for mailing, but when it is received by the court.

We conclude that the appellant failed to file his application to reopen his appeal in conformity with App.R. 26(B), when he filed the application after the ninety-day period had expired, and when he failed to demonstrate good cause for the delay. Accordingly, this court hereby denies the application.

*To the Clerk:*

Enter upon the Journal of the Court on _____7/31/01_____

per order of the Court _____
Presiding Judge

(COPIES SENT TO ALL PARTIES.)

2

# The Supreme Court of Ohio

FILED

OCT 24 2001

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,
    Appellee,          :
                  :

      v.             :

Edward Smith,
    Appellant.       :
                  :

Case No.  01-1509

E N T R Y

    Upon consideration of the jurisdictional memoranda filed in this case, the Court dismisses the appeal as not involving any substantial constitutional question.

COSTS:

    Docket Fee, Affidavit of Indigency filed.

    (Hamilton County Court of Appeals;  No. C990689)

THOMAS J. MOYER
Chief Justice

0019r102401

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

STATE OF OHIO

                          APPEAL NO. C-990689

       Appellee,

vs.

                         ENTRY OVERRULING
                         APPLICATION FOR
                         RECONSIDERATION

EDWARD SMITH

       Appellant,

       This cause came on to be considered upon the PRO SE application of the appellant filed herein for reconsideration, and

       The Court, upon consideration thereof, finds that the motion is not well taken and is overruled.

To The Clerk:

Enter upon the Journal of the Court on _____9/2/01_____ per order of the Court.

By: _____    (Copies sent to all counsel)
          Presiding Judge

# The Supreme Court of Ohio

FILED

DEC 05 2001

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,                    :        Case No.  01-1713
        Appellee,                 :

             v.                   :              E N T R Y

Edward Smith,                     :
        Appellant.                :

Upon consideration of the jurisdictional memoranda filed
in this case, the Court declines jurisdiction to hear the case
and dismisses the appeal as not involving any substantial
constitutional question.

COSTS:

    .Docket Fee, Affidavit of Indigency filed.


    (Hamilton County Court of Appeals;  No. C990689)


THOMAS J. MOYER
Chief Justice

0027r120501