IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EDWARD SMITH,                  :
                               :
       Petitioner              :
                               :   Case Number: 1:01cv814-SJD
    vs.                        :
                               :   District Judge Susan J. Dlott
ANTHONY BRIGANO, Warden        :
                               :
       Respondent              :

ORDER

This matter is before the Court pursuant to the Order of General Reference in the United States District Court for the Southern District of Ohio Western Division to United States Magistrate Judge David S. Perelman. Pursuant to such reference, the Magistrate Judge reviewed the pleadings and filed with this Court on April 27, 2004 Report and Recommendations (Doc. 20). Subsequently, the petitioner filed objections to such Report and Recommendations.

The Court has reviewed the comprehensive findings of the Magistrate Judge and considered de novo all of the filings in this matter. Upon consideration of the foregoing, the Court does determine that such Recommendations should be adopted.

IT IS ORDERED THAT petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. Sec 2254 is hereby DENIED with prejudice. The petitioner's motion for a writ of mandate and writ of mandamus for reopening direct appeal (Doc. 11) is hereby DENIED as moot.

With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of this order would not be taken in "good faith" and therefore DENIES petitioner leave to appeal *in forma pauperis. See* Fed. R.

App. P. 24(a); *Kincade v Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

  A certificate of appealability shall not issue with respect to the dismissal on procedural default grounds of the claims asserted in the petition as grounds five, seven, eight and nine because jurists of reason would not find it debatable whether this Court is correct in its procedural ruling as required under the first prong of the two-part standard enunciated in *Slack v McDaniel*, 529 U.S. 473, 484-85 (2000), which is applicable to procedurally-barred claims. A certificate of appealability shall not issue with respect to petitioner's remaining grounds for relief because petitioner has failed to make a substantial showing of the denial of a constitutional right remediable in this federal habeas corpus proceeding. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Petitioner has not shown that reasonable jurists could debate whether these claims should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 323-24 (2003)(quoting *Slack v McDaniel* 529 U.S. 473, 483-84 (2000))(in turn quoting *Barefoot v Estelle*, 463 U.S. 880, 893 n. 4(1983)).

  IT IS SO ORDERED.

                  s/Susan J. Dlott
                  Susan J. Dlott
                  United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EDWARD SMITH, :
:
      Plaintiff(s) :
: Case Number: 1:01cv814-SJD
vs. :
: District Judge Susan J. Dlott
ANTHONY BRIGANO, Warden :
:
      Defendant(s) :

JUDGMENT IN A CIVIL CASE

Decision by Court: This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

. . . that petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. Sec 2254 is hereby DENIED with prejudice. The petitioner's motion for a writ of mandate and writ of mandamus for reopening direct appeal (Doc. 11) is hereby DENIED as moot.

. . . that with respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of this order would not be taken in "good faith" and therefore DENIES petitioner leave to appeal *in forma pauperis*. *See* Fed. R. App. P. 24(a); *Kincade v Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

. . . that a certificate of appealability shall not issue with respect to the dismissal on procedural default grounds of the claims asserted in the petition as grounds five, seven, eight and nine because jurists of reason would not find it debatable whether this Court is correct in its procedural ruling as required under the first prong of the two-part standard enunciated in *Slack v McDaniel*, 529 U.S. 473, 484-85 (2000), which is applicable to procedurally-barred claims. A certificate of appealability shall not issue with respect to petitioner's remaining grounds for relief because petitioner has failed to make a substantial showing of the denial of a constitutional right remediable in this federal habeas corpus proceeding. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Petitioner has not shown that reasonable jurists could debate whether these claims should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 323-24 (2003)(quoting *Slack v McDaniel* 529 U.S. 473, 483-84 (2000))(in turn quoting *Barefoot v Estelle*, 463 U.S. 880, 893 n. 4(1983)).

9/2/04                                                                   JAMES BONINI, CLERK

                                                                                     ___s/Stephen Snyder_____
                                                                                     Deputy Clerk

```
 1         A.    Mr. Calstrum did not know.
 2         Q.    Did any of the agents involved give
 3   permission for you to assist?
 4         A.    No.
 5         Q.    You asked to get involved, you weren't
 6   asked; you wanted to get involved in this matter, correct?
 7         A.    You asked me two questions.
 8         Q.    You asked the chief if you could get
 9   involved, correct?
10         A.    I asked if I could assist them, yes, sir.
11         Q.    I believe you asked if you could get
12   involved.  As a matter of fact, you asked him if he would
13   mind if you assisted, did you not?
14         A.    I think we're saying the same thing, sir.
15         Q.    Just to be clear, you went to the chief
16   and asked if he would mind if you assisted, correct?
17         A.    That is correct.
18         Q.    Now, at the time you got involved, you
19   were not a sworn Cincinnati police officer, correct?
20         A.    I was not a Cincinnati police officer.
21         Q.    And what is the FBI protocol when you get
22   involved in an investigative matter in a foreign
23   jurisdiction, are you required to notify your agent in
24   charge?
25         A.    You asked me two questions there, sir.
```

1   Q.    Are you required to notify the agent in
2   charge, or his representative, if you get involved in a
3   criminal investigation in another jurisdiction?
4   A.    That is correct.
5   Q.    And that's why your agent in charge was
6   in New York, and he was the only -- and that's where
7   geographical limits were, unless he authorized you to
8   travel outside those limits or be involved in an
9   investigation outside of those limits, is it not?
10  A.    That is not the FBI protocol, sir.
11  Q.    So you can go where you want?
12  A.    Would you like for me to explain the
13  protocol to you?
14  Q.    I'd like the answer to my question.  Can
15  you go where you want?
16  A.    No, you cannot go where you want.
17  Q.    Can you volunteer to assist any
18  department that you want to get involved in?
19  A.    I can volunteer, that is correct.
20  Q.    And you need no prior permission?
21  A.    With permission, yes, sir.
22  Q.    Did you have permission?
23  A.    I did not.
24  Q.    Now, when you went with Mr. Spikner to
25  this garage, how did you know that that was Ed Smith's

```
 1   garage?
 2        A.     Mr. Spikner told me it was his.
 3        Q.     He told you that it was Ed Smith's
 4   garage?
 5        A.     He told me that's where he stored the
 6   tools, yes, sir.
 7        Q.     Where was your warrant to go inside?
 8               MR. LEON:  Objection.
 9               THE COURT:  Overruled.
10        A.     I had no warrant.
11        Q.     You had no authority to go inside,
12   correct?
13               MR. LEON:  Objection.
14               THE COURT:  Overruled.
15        A.     I did not have a warrant, no, sir.
16        Q.     As a matter of fact, the police chief you
17   talked to was the chief of Lincoln Heights?
18        A.     Yes.
19        Q.     He had no authority to police the streets
20   of the City of Cincinnati, did he?
21               MR. LEON:  Objection.
22               THE COURT:  Sustained.
23        Q.     Did you ever ask him if you were
24   permitted to go into the City of Cincinnati?
25               MR. LEON:  Objection.
```

```
1              THE COURT:  Overruled.  You may answer.
2       A.     No, sir, I did not.
3       Q.     Now, what could have happened is that you
4  could have endangered a private citizen by going into
5  property that is not authorized to go into, for which you
6  had no warrant, correct?
7              MR. LEON:  Objection.
8              THE COURT:  Overruled.
9              MR. LEON:  Can we approach?
10             THE COURT:  Yes.
11             (The following proceedings were had at
12       sidebar conference.)
13             MR. LEON:  Judge, the insinuation that a
14  warrant was somehow required is something -- it's
15  a legal conclusion.  The jury needs to know and
16  understand that a warrant's not required for the
17  employee of the defendant to go into the garage
18  that he works in.  This is misleading the jury.
19             THE COURT:  Well, go ahead, Mr. Burlew.
20             MR. BURLEW:  Judge, I'm not misleading
21  the jury.  I think the State went into all of this
22  and tried to qualify him as an expert law
23  enforcement officer.  He violated his own
24  protocol.  And that's just a fact, that he had no
25  warrant, no authority.  I'm not attacking the
```

search, we've done that pretrial.

MR. LEON: Exactly. That's my point.

MR. BURLEW: I'm not trying to suppress anything.

MR. LEON: I don't have a problem with the questions, necessarily, other than the fact that the insinuation here is that he violated a duty to get a warrant when, in fact, it wasn't necessary. And, you know, it's a legal conclusion. It's not a whole lot different than having a statement with a motion to suppress, and then in trial attacking the propriety of taking the statement. It's a pretrial decision we're talking about.

THE COURT: Actually, with respect to a statement, it's both a trial and a pretrial. So I disagree on that point. I understand the point you're trying to make, though.

MR. BURLEW: I'm not attacking the search, but you can't hold him up as the world's greatest policeman, and have him violate rules. It's disingenuous.

MR. LEON: But he did not violate a rule about a warrant, and that's the implication, because he went to a garage that this employee had

```
 1              access to.
 2                   THE COURT:  The reason I permitted -- I
 3              take all this as seeking my explanation as to the
 4              reason for my ruling.  And the reason I permitted
 5              it is that number one, a law enforcement officer
 6              cannot direct somebody to do something and make it
 7              a permissible search, number one.  So I disagree
 8              with your legal conclusion that the officer can
 9              direct a private citizen to enter a private space
10              and obviate the need for a warrant.
11                   Number two, there's no basis for a
12              contention that this person, Mr. Spikner, had the
13              authority.  I have heard no testimony that he had
14              the authority to consent to a search.  So I
15              disagree with your overall premises.
16                   Number two, what -- you set him up as
17              probably the most experienced law enforcement
18              officer that's going to be testifying in this
19              trial.  And, certainly, if he's circumventing a
20              procedure, that's something that Mr. Burlew's
21              entitled to bring to the jury's attention.
22                   Number three, I permitted that last
23              question, and that's what I think brought us all
24              up here, because he's testified that he took
25              certain actions to protect the safety of a private
```

```
 1              citizen.  And the last question, I believe,
 2              Mr. Burlew just asked, was what he was doing
 3              actually endangering Mr. Spikner, so that would
 4              contradict his previous testimony.  So that's why
 5              I permitted that question.
 6                        (The following proceedings were had in
 7              open court, in the presence of the jury.)
 8                        MR. BURLEW:  Would you read the last
 9              question back.
10                        (The pending question was read back by
11              the court reporter.)
12                        THE COURT:  Sir, go ahead and answer.
13              A.        That is correct.
14              Q.        Now, you talked about your training, what
15   is your homicide training?
16              A.        I worked approximately seven homicide --
17              Q.        When was that?
18              A.        I worked five in Lincoln Heights.
19              Q.        How many years ago was that?
20              A.        That was in 1972 through '78.
21              Q.        Okay.
22              A.        And I worked two in Woodlawn.
23              Q.        Any with the FBI?
24              A.        Homicides?  No.
25              Q.        So your training insofar as homicide or
```

```
 1   homicide investigation was limited to what was available
 2   to you in Lincoln Heights and Woodlawn, right?
 3          A.      That's correct.
 4          Q.      You're not claiming that you're an expert
 5   homicide investigator, are you?
 6          A.      No, sir.
 7                  MR. BURLEW:  Just one moment, Your Honor.
 8                  THE COURT:  Yes.
 9                  MR. BURLEW:  One other question.  Sorry.
10                  THE COURT:  That's okay.
11          Q.      You indicated that you drew your weapon,
12   correct?
13          A.      Yes.  Yes, sir.
14          Q.      And you're trained by the FBI, correct?
15          A.      Yes, sir.
16          Q.      You only draw your weapon when you're
17   ready to kill, correct?
18          A.      In preparation thereof, yes, sir.
19          Q.      You are not to draw your weapon unless
20   you're prepared to fire it and kill, correct?
21          A.      That is correct.
22          Q.      You're not trained to shoot to wound or
23   to pull that weapon to scare, intimidate, or frighten, but
24   to kill?
25          A.      That is correct.
```

1  Q.  So with no homicide investigation, without notifying the agent in charge, you took a private citizen to the scene, and you were prepared to kill?

4  A.  That is correct.

5  MR. BURLEW:  Thank you.

## REDIRECT EXAMINATION

BY MR. LEON:

8  Q.  Did you -- did you force Mr. Spikner to take you to the storage area?

10  A.  He volunteered.  He wanted to check to see -- he was supposed to work that day, he wanted to check to see if the tools were there.

13  MR. BURLEW:  Objection.

14  THE COURT:  I'll permit it.

15  MR. LEON:  Nothing further.

16  THE COURT:  Anything further?

17  MR. BURLEW:  Nothing further.

18  THE COURT:  May I excuse this witness?

19  MR. LEON:  Yes, ma'am.

20  MR. BURLEW:  No objection.

21  THE COURT:  You are free to go about your business.

23  (Witness excused.)

24  THE COURT:  Is this a good time for a break?  Let's take our break, till twenty minutes

1  corruption; that's about it.
2     Q.     Okay. And have you done -- been involved
3  in undercover situations that involve dangers?
4           THE COURT: Can we move this along?
5           MR. LEON: This is my last question.
6           THE COURT: I don't know the relevancy.
7           MR. LEON: I'll tie it up.
8           THE COURT: Let me see you at sidebar,
9  please.
10          (The following proceedings were had at
11  sidebar conference.)
12          MR. LEON: What?
13          THE COURT: What's the relevancy? Is he
14  an expert witness or something?
15          MR. LEON: He will be testifying that
16  when he came upon the situation, that he was --
17  basically, his training and his experience as a
18  police officer, he was frightened enough to pull
19  his firearm when he saw what was happening between
20  Spikner and the defendant. He's a trained --
21          THE COURT: What's the relevancy?
22          MR. LEON: There's a dispute here about
23  whether or not the defendant had a gun. This
24  witness will testify that Spikner told him that he
25  had a gun. He withdrew his weapon when they came

1    on the scene because of his fear, based on his
2    training. That gives relevance to his actions.
3             MR. BURLEW: Spikner never testified to
4    that.
5
6             THE COURT: Spikner never said he saw a
     gun. You don't object?
7
              MR. BURLEW: I do object.
8
              MR. LEON: He's going to testify --
9
              THE COURT: No. Are you trying to
10   impeach your own witness?
11
              MR. LEON: No.
12
              THE COURT: Then I'm not allowing it.
13   Thank you.
14
              (The following proceedings were had in
15   open court, in the presence of the jury.)
16   BY MR. LEON:
17
         Q.       On December the 27th, 1996, were you in
18   Lincoln Heights?
19
         A.       I was.
20
         Q.       And you were here for what reason?
21
         A.       I was on vacation.
22
         Q.       You are related or were related to the
23   victim in this case, Eugene Jenkins?
24
         A.       That's correct.
25
         Q.       What was your relationship?